IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:17-CT-3265-FL

THOMAS BAYE,                          )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )
                                      )                    ORDER
UNITED STATES OF AMERICA,             )
NURSE LANE, and NURSE BORGES,         )
                                      )
                    Defendants.[1]    )

        This matter is before the court on defendants' motion for summary judgment (DE 113) and

plaintiff's motion for partial summary judgment (DE 118).   The motions were briefed fully and

in this posture the issues raised are ripe for ruling.

### STATEMENT OF THE CASE

        Plaintiff, a federal inmate proceeding pro se, commenced this action by filing complaint

on November 16, 2017, alleging claims pursuant to the Federal Tort Claims Act ("FTCA"), 28

U.S.C. §§ 2671–2680, and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,

403 U.S. 388 (1971).   Plaintiff alleges he slipped on a wet floor at the Federal Correctional

Complex in Butner, North Carolina ("FCC-Butner") due to defendant United States' negligence,

and that defendants Nurse Lane ("Lane") and Nurse Borges ("Borges") failed to provide

constitutionally adequate medical treatment for his resulting knee injury.   Plaintiff seeks

compensatory and punitive damages.

---

[1]        The court dismissed formerly named defendants Warden FCI Butner Low, Butner Food Services Director,
and Dining Hall Supervisory Staff by separate order entered August 3, 2018.

Following an extended period of discovery, and in accordance with the court's case management orders, defendants moved for summary judgment on October 28, 2021. In support of the motion, defendants rely upon memorandum of law, statement of material facts, and appendix of exhibits comprising the following: 1) declaration of Andrew Stock, clinical director at FCC-Butner's medical center; 2) plaintiff's medical records; 3) excerpts of transcript of plaintiff's deposition; 4) declaration of Lesley Smith, FCC-Butner human resources specialist; and 5) declarations of defendants Lane and Borges. Plaintiff responded in opposition, relying upon a memorandum of law, opposing statement of material facts, and the appendix of exhibits filed in support of his motion partial for summary judgment. Defendants replied in support of their motion for summary judgment, relying upon reply statement of material facts.

Plaintiff moved for partial summary judgment as to the negligence and breach elements of his FTCA claim, on November 1, 2021. In support of the motion, plaintiff relies upon memorandum of law, statement of material facts, and appendix of exhibits comprising the following: 1) plaintiff's declarations; 2) excerpts of transcript of plaintiff's deposition, 3) defendants' responses to plaintiff's interrogatories; 4) plaintiff's medical records; 5) FCC-Butner post orders for food service employees; 6) Federal Bureau of Prisons' ("FBOP") program statement regarding national occupation safety and health policy; 7) FCC-Butner's job orientation materials; 8) declarations of inmates Jose Ibarra, Fred Winterroth, Jose Abundis, Salvador Villanueva-Fabela; Victor Lynn, Timothy Strickland, George Ward, and Peter Stuyvesant; 9) medical information about fractured patella; 10) photographs of FCC-Butner's dining hall; 11) FCC-Butner work requests for dining hall appliances; 12) FCC-Butner work assignments and training documents; 13) FBOP uniform basic safety regulations; and 14) FCC-Butner complex supplement addressing medical and dental care of inmates. Defendant responded in opposition,

2

relying upon a memorandum of law and opposing statement of material facts. Plaintiff replied in further support of his motion.

## STATEMENT OF FACTS

The facts, viewed in the light most favorable to plaintiff, may be summarized as follows.

A.    Plaintiff's slip and fall

Plaintiff entered FBOP custody in August 2015, and he was initially housed at FCC-Butner's low security correctional institution. (Pl's Stmt. (DE 118) ¶ 1; Pl's Dep. (DE 91) at 6, 10–11).[2] On August 20, 2016, plaintiff slipped on a wet floor in the dining hall. (Pl.'s Dep. (DE 91) at 11–12). His kneecap hit the ground first, causing a fractured patella. (Id.; Medical Records (DE 58) at 10). At least six FBOP employees were present at the time of plaintiff's fall. (Pl's Stmt. (DE 118) ¶¶ 5–7, 10; Pl's Dep. (DE 91) at 32–34; Post Orders (DE 58-5) at 2). However, neither the officers nor the responsible inmate orderlies placed a wet floor sign near the spill or removed the water prior to plaintiff's fall. (See Pl's Stmt. (DE 118) ¶¶ 3, 10; Pl's Dep. (DE 91) at 11, 16–17 33–34; Ibarra Decl. (DE 58-8) at 1; Abundis Decl. (DE 58-8) at 3).

Several appliances in the dining hall were leaking water in the months leading up to plaintiff's fall. (Strickland Decl. (DE 91) at 44–45; Lynn Decl. (DE 91) at 42). These appliances included the ice dispenser, cold and hot water dispensers, ice baths for the salad bars, and steam-producing appliances for the hot bar. (Strickland Decl. (DE 91) at 44–45; Lynn Decl. (DE 91) at 42). During this time period, the drainpipe for the ice machine and other water-based appliances was misaligned with pipe in the floor, which caused "continuous" leakage from underneath these

---

[2]    Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document. The citations to the record in plaintiff's statement of material facts (DE 118) are to the exhibits filed at docket entries 58 and 91.

Case 5:17-ct-03265-FL    Document 128    Filed 03/30/22    Page 3 of 21

machines that spread into the dining hall. (Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42). Although FBOP employees placed baking pans underneath the appliances to prevent leakage, these pans were "rarely emptied and frequently overflowed." (Strickland Decl. (DE 91) at 44). Plaintiff was approximately 15 feet away from these appliances when he fell. (Pl's Decl. (DE 91) at 114).

In addition to the leaking appliances, the dining hall floor was wet "on a daily basis" during the months leading up to plaintiff's fall, from inmates spilling ice or drinks during lunch, or spills that occurred when inmate orderlies refilled the ice machines. (Lynn Decl. (DE 91) at 42, Ward Decl. (DE 91) at 47; Stuyvesant Decl. (DE 91) at 54). Inmates also placed discarded food and drink items into 50-gallon drums situated on four-wheeled frames. (Stuyvesant Decl. (DE 91) at 54). When the orderlies moved these drums through the dining hall, they "often left a trail of slop water residue trailing from the front of the dining hall, through the refreshment line, past the serving line and into the kitchen." (Id.). Orderlies also moved large racks containing wet trays or silverware through the dining hall, leaving additional trails of water. (Id.). These areas were not cleaned or dried during meals, and FBOP staff did not place wet floor signs in the pertinent areas. (Lynn Decl. (DE 91) at 42).

As a result of the foregoing, inmates frequently slipped on the wet floors in the dining hall, including in the weeks leading up to plaintiff's fall. (Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42, Ward Decl. (DE 91) at 47; Stuyvesant Decl. (DE 91) at 54). As discussed further below, plaintiff knew that inmates had slipped on the dining hall floor before his fall, and he observed water spills in that location "all of the time." (Pl's Dep. (DE 91) at 31-32). FBOP employees also were aware of the slick conditions in the dining hall based on the number of inmate falls, inmate reports about the wet conditions, and their personal observations. (Pl's Stmt. (DE

4

118) ¶ 17; Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42, Ward Decl. (DE 91) at 47; Stuyvesant Decl. (DE 91) at 54).   Correctional officers also placed non-slip mats around the leaking appliances and ice baths for brief periods of time, but removed them when they also became wet.   (Strickland Decl. (DE 91) at 44–45).

B.    Plaintiff's Medical Care

After the fall, an officer escorted plaintiff to the health services department, located a short distance from the dining hall.   (Pl's Dep. (DE 91) at 24; Pl's Stmt. (DE 118) ¶ 20).   Plaintiff was limping and requested at least one break during the brief walk.   (Pl's Dep. (DE 91) at 12).   His knee was visibly swollen.   (Id.).

Defendant Lane, an FBOP nurse, met plaintiff outside the health services department and took him inside.   (Id.).   Plaintiff advised defendant Lane how he injured his knee in the dining hall and explained he was in significant pain.   (See id.).   She took his temperature and blood pressure but refused to conduct a tactile examination of plaintiff's knee.   (Id.).   Instead, she informed plaintiff that it was going to hurt for "a while" and advised him to rest the knee, ice it, keep it elevated, and apply compression, also known as the "RICE" technique.   (Id. at 12–13). Plaintiff, however, lacked access to significant supplies of ice, or medical equipment to elevate the knee or apply compression.   (See id. at 13).   In addition, plaintiff was assigned to a top bunk, and he was a unit orderly, a position that required significant walking.   (Pl's Decl. (DE 91 at 114). Although informed of these limitations on plaintiff's ability to rest, ice, elevate, or compress the knee, defendant Lane refused to order a "medical idle" status, a bottom bunk, or the medical equipment that would have allowed plaintiff to implement her instructions.   (Id. at 114–15).   She also refused to order over-the-counter pain medications even though the commissary was not open on the weekends and thus plaintiff could not purchase the medication himself.   (Id. at 115–16).

5

Instead, she told plaintiff to "do the best you can." (Pl's Dep. (DE 91) at 13). Finally, defendant Lane did not order an immediate x-ray or schedule an appointment with a nurse practitioner or physician's assistant who could provide additional treatment. (See id.; Medical Record (DE 58-4) at 1–2). She did, however, advise plaintiff to return to health services if his knee did not improve in a few days. (Pl's Dep. (DE 91) at 12).

Plaintiff continued to have significant pain in the days following his appointment with defendant Lane. (Medical Records (DE 58-4) at 3–7). As instructed by defendant Lane, he returned to the health services department on August 25, 2016. (Id. at 3–4). Defendant Borges, a nurse, met with plaintiff for this appointment. (Id.). Plaintiff informed her of his fall and ensuing symptoms, reporting pain level of 7 on a scale of 1 to 10. (Id.). Defendant Borges advised plaintiff to continue with the RICE intervention, counseling him that soft-tissue injuries can take time to heal, and that the "provider" recommended this course of action at this time. (Id.; see also Defs' Stmt. (DE 115) ¶ 16; Medical Records (DE 64-2) at 49 (Dr. Roscoe Ramsey co-signing approval of defendant Lane's recommendations)). Although defendant Borges took plaintiff's blood pressure and pulse, she refused to conduct a tactile examination of plaintiff's knee. (Medical Records (DE 58-4) at 3–4). Similar to defendant Lane, she further refused to place plaintiff on a "medical idle" duty status, order a bottom bunk assignment, or provide him with medical equipment to assist him with resting, elevating, or compressing the knee. (Pl's Decl. (DE 91) at 114–115). She also refused to seek approval for prescription pain relievers, or schedule an immediate appointment with a nurse practitioner or physician's assistant, although she did advise plaintiff to follow-up with sick call as needed. (See Medical Records (DE 58-4) at 3–4).

On August 29, 2016, plaintiff returned to the health services department, and reported continued knee pain, exacerbated by walking and other movement. (Id. at 4–5). Defendant

6

Borges saw plaintiff, and she referred him for a same-day appointment with Brandon Jones, a nurse practitioner. (Id. at 5). Jones evaluated plaintiff's knee, observed "notable" swelling and tenderness, and ordered an x-ray on an expedited basis. (Id. at 8). He also prescribed steroids to treat the inflammation. (Id.). The x-ray, performed the following day, showed that plaintiff had fractured his patella. (Id. at 9). Jones ordered that plaintiff should be placed in knee immobilizer and given a wheelchair and crutches. (Id. at 10). He also prescribed pain medication and referred plaintiff to the orthopedic team for further evaluation. (Id. at 7).

Following plaintiff's referral to the orthopedic team, plaintiff underwent three surgeries: the first to repair the patella, the second to remove medical screws used during the first surgery, and third to repair other issues with cartilage damage and pain in the kneecap region. (Id. at 14–15, 52–53, 75–76). He continues to suffer from significant knee pain, and has been diagnosed with traumatic degenerative joint disease, patellar tendinopathy, soft tissue damage, loss of flexion, and various other disorders of the knee. (Id. at 65–71, 91–94). On May 20, 2019, Dr. Clifford Wheeless, an orthopedist, recommended total knee replacement. (Id. at 85). FCC-Butner's utilization review committee, however, denied the request for a total knee replacement on October 24, 2019. (Id. at 97–98).

Additional facts will be discussed in the analysis herein.

## COURT'S DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court "consider[s] each motion separately on its own merits to determine whether [any] of the parties deserves judgment as a

7

matter of law." Defs. Of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014).[3]

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

---

[3]     Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

1.      Premises Liability

The parties cross move for summary judgment on plaintiff's premises liability claim. The court begins with defendant United States' motion.

"An action under the FTCA may only be maintained if the Government would be liable as an individual under the law of the state where the negligent act occurred." Kerns v. United States, 585 F.3d 187, 194 (4th Cir. 2009). Accordingly, the court must "apply the substantive law of the state where the alleged tort took place." Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009).

Under North Carolina law, "the standard of care a landowner owes to persons entering upon his or her land is to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors." Martishius v. Carolco Studios, Inc., 355 N.C. 465, 473 (2002) (citing Nelson v. Freeland, 349 N.C. 615, 632 (1998)). The standard requires "ordinary care to keep in a reasonably safe condition those portions of [the landowner's] premises which it may expect will be used by [other persons], and to give warning of hidden perils or unsafe conditions

9

insofar as they can be ascertained by reasonable inspection and supervision." Roumillat v. Simplistic Enterprises, Inc., 331 N.C. 57, 64 (1992), abrogated on other grounds by Nelson, 349 N.C. at 615. "In order to prove a defendant's negligence in a premises liability case, the plaintiff must first show that the defendant either (1) negligently created the condition causing the injury, or (2) negligently failed to correct the condition after actual or constructive notice of its existence." Id.; see Rolan v. N.C. Dep't of Agric. & Consumer Servs., 233 N.C. App. 371, 382 (2014).

However, a "proprietor has no duty to warn an invitee of an obvious danger or of a condition of which the invitee has equal or superior knowledge." Roumillat, 331 N.C. at 66; see also Draughon v. Evening Star Holiness Church of Dunn, 374 N.C. 479, 480 (2020). This is because [r]easonable persons are assumed, absent a diversion or distraction, to be vigilant in the avoidance of injury in the face of a known and obvious danger." Roumillat, 331 N.C. at 66. "A condition is open and obvious if it would be detected by any ordinarily intelligent person using his eyes in an ordinary manner." Draughon, 374 N.C. at 483; Coleman v. Colonial Stores, Inc., 259 N.C. 241, 242 (1963). And "[i]f the condition is open and obvious, a visitor is legally deemed to have equal or superior knowledge to the owner, and thus a warning is unnecessary. Draughon, 374 N.C. at 483; Branks v. Kern, 320 N.C. 621, 624 (1987), abrogated on other grounds by Nelson, 349 N.C. at 615.

The court first summarizes the evidence relevant to defendants' assertion that wet floor was open and obvious. Plaintiff describes a dining hall with near constant water spillage. The inmate witnesses explained that ice machines and other appliances leaked water onto the floor "continuously." (Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42). The baking pans placed underneath these devices were 'rarely emptied and frequently overflowed." (Strickland Decl. (DE 91) at 44). The dining hall floor was wet "on a daily basis" due to other inmates spilling

10

ice and drinks, or inmate orderlies spilling ice when refilling the ice machines. (Lynn Decl. (DE 91) at 42, Ward Decl. (DE 91) at 47; Stuyvesant Decl. (DE 91) at 54). Inmate orderlies also transferred fifty-gallon drums through the dining hall, "often" leaving trails of dripping water behind. (Stuyvesant Decl. (DE 91) at 54). As a result of the foregoing, inmates frequently slipped on the wet floors in the dining hall, including in the weeks leading up to plaintiff's fall. (Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42, Ward Decl. (DE 91) at 47; Stuyvesant Decl. (DE 91) at 54).

Plaintiff himself was aware of these constant spills prior to his fall. Plaintiff testified as follows at his deposition:

> Q:    So from the time you first got to this complex, this prison, to the time that you fell on the floor, had you ever seen anybody slip in the dining hall before?
> A:    Accidents happen in the dining hall all the time. Can I quote a certain day, no.
> Q:    But do you recall – do you recall it happening before your accident?
> A:    I have, yeah. I have seen people slip and fall.
> . . .
> Q:    Have you ever seen a spill in the dining hall before?
> A:    All of the time.
> Q:    So it wasn't usual to have water on the floor?
> A:    . . . Sometimes people spill.

(DE 91 at 31–32). Furthermore, plaintiff was intimately familiar with the dining hall where he had meals two to three times per day. (See Pl's Dep. (DE 91) at 6–7).

The undisputed evidence recited above shows that water spills in the dining hall were an open and obvious danger, that plaintiff had equal or superior knowledge of the risk of falling on the "continuously" wet floor, and that "any ordinarily intelligent person using his eyes in an ordinary manner" would have detected the slick floor. Draughon, 374 N.C. at 483. The open and obvious danger doctrine therefore bars plaintiff's premises liability claim.

Plaintiff also chose to traverse the floor holding his tray in a manner that obstructed his

11

view of the floor. (Pl's Dep. (DE 91) at 14–17; Pl's Mem. (DE 121) at 17 (arguing that the tray obstructed plaintiff's view of the floor)). As the Supreme Court of North Carolina recently explained,

> Summary judgment is further supported when the plaintiff has had the opportunity to become familiar with the condition that contributes to his injury. In <u>Dunnevent v. Southern Railroad Co.</u>, 167 N.C. 232, 233–34 (1914), the plaintiff fell off of the defendant's railroad platform at night. This Court held that because the plaintiff had become familiar with the platform previously during the day, but chose to walk without his lantern in an area he should have known had no railing, his recovery was barred. Likewise, in <u>Holland</u>, this Court barred recovery to the plaintiff, an automobile mechanic, who tripped on a common piece of garage equipment that sat on the floor in an area through which the plaintiff had already walked multiple times shortly before the accident. 266 N.C. at 751.

<u>Id.</u> at 484–85. A reasonable person with knowledge of the wet floors at FCC-Butner's dining hall would not have traversed those floors with an obstructed view. <u>See id.</u>; <u>Roumillat</u>, 331 N.C. at 66.

Plaintiff responds that the precise water he slipped on was not open and obvious. (<u>See</u> Pl's Mem. (DE 121) at 17). The dangerous condition in this case, however, was the "continuously" wet floor that plaintiff traversed with an obstructed view. (Pl's Dep. (DE 91) at 14–17; Pl's Mem. (DE 121) at 17; Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42). <u>Draughon</u> establishes that a plaintiff's extensive familiarity with a dangerous condition establishes as a matter of law that the danger was open and obvious, and the failure to appreciate the danger on a particular occasion is insufficient to overcome the defense. <u>Draughon</u>, 374 N.C. at 484–85; <u>see also</u> <u>Byrd v. Arrowood</u>, 118 N.C. App. 418, 421–22 (1995) (holding defendant had no duty to warn plaintiff of slippery floor when it was raining outside and plaintiff failed to inspect floor where she fell). In addition, the specific water that plaintiff fell on was open and obvious enough to be observed by three different inmates. (<u>See</u> Ibarra Decl. (DE 58-8) at 1; Winterroth Decl. (DE 58-8) at 2; Abundis Decl. (DE 58-8) at 3).

12

The court alternatively finds that plaintiff has failed establish a triable issue of fact on the elements of his premises liability claim. Roumillat, 331 N.C. at 64. Plaintiff's claims that defendant United States created the danger, or had actual or constructive notice of the wet floor, fail because plaintiff cannot prove negligence or survive summary judgment by stacking inference upon inference. See Lane v. Bryan, 246 N.C. 108, 112 (1957); see also Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

Plaintiff's theory that defendant United States created the danger relies on his evidence that the drainpipe to the water appliances was misaligned, causing continuous spillage. (Pl's Mem. (DE 121) at 9–14). But that theory relies on the several inferences. Assuming the drainpipe was misaligned and leaking on the day of the fall, the court still must infer that the leakage spread outward from the machines, then travelled over 15 feet to plaintiff's location, and that it pooled in the precise location where plaintiff fell. (See Pl's Decl. (DE 91) at 113). Plaintiff offers no evidentiary support for the final inferences, and he therefore has not established a triable fact as to his claim that defendant United States created the danger. See Lane, 246 N.C. at 112; see also Thompson v. Wal-Mart Stores, Inc., 138 N.C. App. 651, 654–55 (2000).

Plaintiff's theory of actual notice fails for similar reasons. There is simply no record evidence showing that any FBOP employee had actual knowledge of the precise water spill where plaintiff fell on the date of his fall. That the officers were present in the dining hall when he fell and had a direct line of sight to the water spill does not itself establish actual notice. As noted, plaintiff also offers evidence suggesting the floors were "continuously" wet due to the malfunctioning appliances and other spillage and that defendants were aware of these problems, but that evidence does not establish that the floor was wet on the date of the fall, in the precise location where plaintiff fell, or that FBOP officials had actual knowledge of same. (See

13

Strickland Decl. (DE 91) at 44; Lynn Decl. (DE 91) at 42, Ward Decl. (DE 91) at 47; Stuyvesant Decl. (DE 91) at 54).

Finally, plaintiff argues defendant United States had constructive notice of the hazard. See Roumillat, 331 N.C. at 64; (Pl's Mem. (DE 121) at 14–16). "The length of time for which a dangerous condition . . . must exist to charge a [defendant] with knowledge of it depends on the nature of the [enterprise], the size of the [premises], the number of [persons present], the nature of the dangerous condition, and its location." Norris v. Belk's Dep't Store of Dunn, N.C., Inc., 259 N.C. 350, 353 (1963). Here, even assuming that these factors all support a finding that only a brief period of time is necessary to charge defendant United States with constructive notice, plaintiff offers no circumstantial or direct evidence establishing the duration of time that the water was on the floor. See Nourse v. Food Lion, Inc., 127 N.C. App. 235, 241 (requiring circumstantial evidence showing the dangerous condition was present "for some time"), aff'd, 347 N.C. 666 (1998); Thompson, 138 N.C. App. at 644–45. For the reasons noted above, the evidence showing defendant United States was constructively aware of other spills is not probative of the duration of the hazard at the time and date of defendant's fall.

Plaintiff therefore has not established a triable issue of fact as to the actual or constructive notice element of his claim, or his claim that defendant United States created the dangerous condition. Defendants are entitled to judgment as a matter of law on plaintiff's premises liability claim.

Plaintiff also moves for summary judgment on the duty and breach elements of the premises liability claim. Plaintiff argues that defendant United States failed to comply with Occupational, Safety and Health Administration ("OSHA") regulations and the FBOP program statement implementing same, both of which address requirements for keeping floors clean and

14

dry, and that this establishes "negligence per se." (Pl's Mem. (DE 118) at 18–23 (citing 29 C.F.R. § 1910.21-30 and FBOP Program Statement 1600.11)).

Plaintiff offers no North Carolina law holding that violations of OSHA regulations or FBOP program statements establish negligence per se in a premises liability action. See also Albrecht v. Baltimore & Ohio R. Co., 808 F.2d 329, 332 (4th Cir. 1987) (holding in similar context that violations of OSHA regulations may be considered evidence of negligence, but they cannot establish negligence per se); Thompson, 138 N.C. App. at 656 (explaining that violations of internal safety regulations may be evidence of negligence, but they do not establish negligence as a matter of law). Under the FTCA, the United States is liable only to the extent that plaintiff has a substantive cause of action under state law. Kerns, 585 F.3d at 194. Plaintiff fails to establish that his theory of negligence per se would apply to a North Carolina premises liability case, or that the open and obvious danger doctrine would be inapplicable in such a case. Accordingly, plaintiff's motion for summary judgment must be denied.

2.      Deliberate Indifference to Serious Medical Needs

The court next turns to plaintiff's claims that defendants Lane and Borges were deliberately indifferent to his knee injury. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (1996). "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotations omitted).

The first prong is objective – the inmate must show that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (internal quotations omitted). In the medical

15

context, a basic human need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

The second prong is subjective – the inmate must show that "subjectively the officials acted with a sufficiently culpable state of mind." See Strickler, 989 F.2d at 1379 (internal quotations omitted). The mental state for "deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995); see Farmer, 511 U.S. at 837. A plaintiff therefore must establish the prison official's "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (citing Farmer, 511 U.S. at 837–39).

Deliberate indifference is thus "a particularly high bar to recovery." Iko, 535 F.3d at 241. For claims involving medical care, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Negligence or medical malpractice in diagnosis or treatment are not exceptional circumstances. See id.; see also Estelle v. Gamble, 429 U.S. 97, 105–08 (1976). Finally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003).

16

Defendants do not address the objective prong of the analysis. (See Defs' Mem. (DE 114) at 16–21). As set forth above, plaintiff endured severe pain and his knee injury required multiple surgeries. (See Medical Records (DE 58-4)). The undisputed evidence shows that plaintiff suffered from an objectively serious medical condition. See Iko, 535 F.3d at 241.

The parties instead dispute the subjective prong. As discussed above, plaintiff attests that defendant Lane dismissed his report of severe knee pain, swelling, and other issues without conducting a "tactile" examination of the knee. (Pl's Dep. (DE 91) at 12). But there is no dispute that defendant Lane personally observed plaintiff walk to the health services department, that she provided plaintiff an opportunity to describe his symptoms, and that she understood plaintiff had fallen in the dining hall, injured his kneecap, and had pain in the area.[4] (Id. at 12–13, 24–25, 29). In addition, plaintiff was wearing shorts during the interaction, and defendant Lane documented an "abrasion" on plaintiff's knee, establishing that she examined his knee, although not to the extent plaintiff preferred. (See id. at 20, 29; Medical Record (DE 58-4) at 1). Plaintiff also does not dispute that defendant Lane instructed plaintiff on "RICE" treatment (rest, ice, compression, and elevation), and told plaintiff to return to health services if the pain continued. (See Pl's Dep. (DE 91) at 12–13, 29).

Defendant Lane therefore observed plaintiff ambulate, allowed him to describe his symptoms, briefly examined the knee, and then decided on a course of treatment. (See id.). Plaintiff's complaints that defendant Lane should have conducted further evaluation, referred him to a nurse practitioner or physician's assistant, ordered an x-ray, or prescribed pain medication,

---

[4] To the extent plaintiff himself failed to report important symptoms during his verbal presentation, such as swelling, tenderness, or additional bruising, defendant Lane cannot be deliberately indifferent to symptoms plaintiff never identified. See Jackson, 775 F.3d at 178 (requiring actual subjective knowledge of the medical condition to proceed under a deliberate indifference theory).

17

constitute a disagreement with defendant's Lane evaluation methods and recommended course of treatment, which does not establish deliberate indifference. Wright, 766 F.2d at 849; see also Estelle, 429 U.S. at 107 (holding the decision of whether to order an x-ray is "is a classic example of a mater for medical judgment"); Jackson, 775 F.3d at 178 ("Though hindsight suggests that Lightsey's treatment decisions may have been mistaken, even gravely so, we agree with the district court that Jackson's claim against Lightsey is essentially a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference.").

Plaintiff's claim against defendant Borges fails for similar reasons. Defendant Borges also observed plaintiff ambulate to the nursing station, and allowed plaintiff to describe his symptoms, which he described as a pain level of 7 out of 10. (See Medical Records (DE 58-4 at 3–4). Although plaintiff alleges that defendant Borges failed to conduct a tactile examination of the knee, plaintiff was allowed to self-report any symptoms of swelling, tenderness, or bruising. (See id.). Defendant Borges then reviewed plaintiff's medical record, which included defendant Lane's evaluation and her RICE prescription, and a "co-sign" authorization from Dr. Roscoe Ramsey approving of the treatment plan. (See id.; Medical Records (DE 64-2) at 49). She then determined that RICE and over-the-counter pain medications remained the appropriate course of treatment. (Medical Records (DE 58-4) at 3–4). She further advised plaintiff that "soft tissue injury will take some time to heal and that conversative treatment is recommended by the provider." (Id.).

As discussed above, plaintiff's arguments that defendant Borges should have conducted further evaluation, prescribed different pain relievers, ordered an x-ray, or scheduled an immediate appointment with a provider are mere disagreements with her diagnosis and recommended

18

treatment plan, which do not establish deliberate indifference.  Estelle, 429 U.S. at 107; Jackson, 775 F.3d at 178.  In addition, defendant Borges's reliance on Dr. Ramsey's approval of the treatment plan, as reflected in the statement "conservative treatment is recommended by the provider,"[5] also shields her from a claim of deliberate indifference.  See Iko, 535 F.3d at 242 (observing that non-medical personnel may rely on opinions of "medical experts").

Plaintiff's reliance on Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), is misplaced.  In Loe, the plaintiff alleged defendants delayed treatment for his broken arm for 22 hours.  582 F.2d at 1296.  Loe, however, was decided on a Rule 12(b)(6) motion to dismiss, and the complaint offered "no explanation for the delay" in examination or x-ray of the arm.  Id.  Here, as set forth above, the delayed medical care was the product of defendant Lane and Borges' reasoned medical judgment after evaluating plaintiff's symptoms.  While that judgment turned out to be wrong, it does not amount to deliberate indifference.  See Estelle, 429 U.S. at 107; Jackson, 775 F.3d at 178.

Finally, plaintiff alleges that defendants Lane and Borges refused to his requests for medical idle status, extra ice, a bottom bunk bed, medical equipment that would have allowed plaintiff to elevate and compress the knee, and (in the case of defendant Lane), over-the-counter pain medications.  These allegations also effectively challenge defendants Lane and Borges's medical decisions.  Based on their evaluations, defendants Lane and Borges did not believe that such equipment or interventions were necessary on an emergent basis.  (See Medical Records (DE 58-4) at 1–4; Pl's Dep. (DE 91) at 13).  Plaintiff was instead instructed to "do the best he could" within the confines of his inmate responsibilities, using his top bunk, and the ice and other items

---

[5]     Plaintiff offers no evidence contradicting defendant's statement of material fact that Dr. Ramsey co-signed defendant Lane's note.  (Compare Defs' Stmt. (DE 115) ¶ 16 with Pl's Opp. Stmt. (DE 122) ¶ 16).  Accordingly, this fact is deemed admitted.  See Local Civil Rule 56.1(a)(2).

19

available to him to implement the prescribed interventions.  (Pl's Dep. (DE 91) at 13).  And plaintiff does not suggest that he was prevented from resting the knee during his downtime, obtaining some ice from the machines in his unit, or using makeshift items such as pillows, clothing or other items to elevate and compress the knee.  (See id.).

Moreover, both defendants Lane and Borges advised plaintiff that if his symptoms did not improve quickly, he should return to the health services department for further evaluation. (Medical Records (DE 58-4) at 1–4).  That defendants Lane and Burgess believed the RICE interventions were sufficient for this brief period of time – even without the medical idle status, bottom bunk, extra ice, and medical equipment plaintiff preferred – does not amount to deliberate indifference.  See Farmer, 511 U.S. at 825 (explaining that deliberate indifference requires that the "official . . . both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").  Finally, with respect to defendant Lane's refusal to provide over-the-counter pain medication for less than two days until the commissary opened, there is no evidence suggesting this brief delay in receiving the medications caused a "substantial risk of serious harm."  See Moskos v. Hardee, 24 F.4th 289, 298 (4th Cir. 2022).

The court acknowledges the serious pain plaintiff endured over 10 days until he saw the nurse practitioner, and that plaintiff has suffered permanent knee damage.  On these facts, however, defendants Lane and Borges's failure to diagnose and provide immediate, more intensive treatment for plaintiff's injury does not create a genuine issue of material fact as to a constitutional violation for deliberate indifference to serious medical needs.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 113) is

20

GRANTED, and plaintiff's motion for partial summary judgment (DE 118) is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 30th day of March, 2022.

LOUISE W. FLANAGAN
United States District Judge